UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| DENA COLLEEN MOTT,<br><br>Petitioner,<br><br>v.<br><br>NANCY A. BERRYHILL, Commissioner of Social Security,<br><br>Respondent. | No. 1:17-cv-00882-GSA<br><br>**ORDER DIRECTING ENTRY OF JUDGMENT IN FAVOR OF NANCY BERRYHILL, COMMISSIONER OF SOCIAL SECURITY, AND AGAINST PLAINTIFF DENA COLLEEN MOTT** |

## I.     Introduction

Plaintiff Dena Colleen Mott ("Plaintiff") seeks judicial review of a final decision of the Commissioner of Social Security ("Commissioner" or "Defendant") denying her application for disability insurance benefits pursuant to Title II of the Social Security Act.  The matter is currently before the Court on the parties' briefs which were submitted without oral argument to the Honorable Gary S. Austin, United States Magistrate Judge.[1]  *See* Docs. 15, 18, and 19. Having reviewed the record as a whole, the Court finds that the ALJ's decision is supported by substantial evidence. Therefore, Plaintiff's appeal is denied.

## II.     Procedural Background

On April 6, 2015, Plaintiff filed an application for disability insurance income.  AR 22. She alleged disability beginning July 1, 2014.  AR 22.

---

[1] The parties consented to the jurisdiction of the United States Magistrate Judge.  *See* Docs. 6 and 8.

1

The Commissioner denied the application initially on December 10, 2015, and upon reconsideration on April 5, 2016. AR 22. On April 15, 2016, Plaintiff filed a timely request for a hearing before an Administrative Law Judge. AR 22.

Administrative Law Judge Trevor Skarda presided over an administrative hearing on September 26, 2016. AR 36. Plaintiff, represented by counsel, appeared and testified. AR 36. An impartial vocational expert, Lorian I. Hyatt, (the "VE") also appeared and testified. AR 22, 36.

On December 15, 2016, the ALJ denied Plaintiff's application. AR 22-31. The Appeals Council denied review on April 27, 2017. AR 1-4. On July 1, 2017, Plaintiff filed a timely complaint seeking this Court's review. Doc. 1.

**III.** **Factual Background**

**A.** **Plaintiff's Testimony**

Plaintiff (born April 3, 1961) lives alone. AR 40. She drives her own car, although she generally does not drive more than 50 miles at a time since long-distance travel makes her anxious. AR 40. Plaintiff worked as an operating room technician until she was terminated for health reasons about two years before the administrative hearing. AR 41. Plaintiff's employer reprimanded her in the course of the termination. AR 41. Plaintiff did not think that she was able to return to that sort of work. AR 41.

Plaintiff testified to multiple health issues, including heart problems, kidney issues and osteoarthritis in her back, hands and knees. AR 41-42. Seven times a day Plaintiff needed to rest with her feet up for fifteen minutes, applying ice or heat to her legs. AR 42, 47. She took nitroglycerin for chest pain. AR 42. During questioning, Plaintiff stated that she had communication issues arising from poor focus and concentration. AR 43.

Plaintiff testified that she can use her hands for 20 minutes before needing to rest them for 30 minutes. AR 45-46. Because of pain in her knees and back, she needed to change position throughout the day. AR 46. She could stand for 30 minutes and sit no longer than an hour. AR ///

2

46.  She was able to lift no more than 15 pounds and could not lift 15 pounds as many as two or three times daily.  AR 47.

Plaintiff experienced depression, feeling more sad, depressed, fatigued, and unsocial than she used to feel.  AR 48.  She no longer attended church or participated in social events.  AR 48.  She performed tasks like grocery shopping in the morning when she had more energy.  AR 48.

Plaintiff contended that the agency consultant did not examine her as extensively as the report represented.  AR 51.

## B. Adult Function Report

In an adult function report completed September 14, 2015, Plaintiff complained of anxiety, chest pain, foot pain, and a feeling akin to a heart attack.[2]  AR 219-20.  She had difficulty keeping track of her many medications.  AR 221.  Her high blood pressure medications left her feeling fatigued.  AR 221.  Her physical conditions affected lifting, standing, reaching, walking, sitting, kneeling, stair-climbing, memory, completing tasks, concentration, understanding, and following instructions.  AR 224.  She used a cane when her back was weak.  AR 225.  She handled stress poorly and felt anxious around "a lot of people."  AR 225.

Plaintiff was terminated from her last job through false allegations that she had behavioral problems.  AR 225.  She now did only enough housework to keep things tidy—about three hours a day performed slowly.  AR 221.  She needed others to help her lift objects such as laundry baskets.  AR 221.  She shopped for groceries weekly but was forgetful and tired easily.  AR 222.  Plaintiff attended several church services weekly.  AR 223.  She enjoyed reading and drawing.  AR 223.

## C. Medical Records

According to the administrative record, Plaintiff received all of her medical care in recent years from medical professionals at Sutter Health Care.  The medical notes reflect that Plaintiff

///

[2] Plaintiff explained that when she experiences stress, her heart condition caused blood to "back up" into her kidneys, liver, and carotid arteries AR 219, 259.  The blood's backing up into her carotid arteries simulated the feeling of a heart attack.  AR 219, 259.

received regular treatment in the family practice, cardiology, and endocrinology departments, with consultations in other departments, including orthopedics and behavioral health.

### 1. **Family Practice**

#### a. **Mental Health Issues**

Plaintiff saw family practitioner Kathie L. Cronin, M.D., on April 16, 2015, regarding mental health problems. AR 408-22. Plaintiff told Dr. Cronin that she was experiencing a racing mind, talking to herself, and engaging in risky behaviors such as driving too fast and spending over her budget. AR 409. She told the doctor that she was crying, sad, depressed, and having suicidal thoughts. AR 409. Dr. Cronin noted that Plaintiff had pressured speech, was hard to keep on track, had suicidal thoughts but no plan, and cried once during the appointment. AR 411. Plaintiff declined a prescription for an antidepressant medication. AR 412.

Plaintiff returned to see Dr. Cronin on March 16, 2016. AR 631. Dr. Cronin declined to diagnose bipolar disorder and referred Plaintiff to the Behavioral Health department. AR 631.

#### b. **Hand Pain**

On April 7, 2016, Plaintiff saw Dr. Cronin regarding back and hand pain. AR 669. On August 16, 2016, Plaintiff saw family practitioner Ying Luo, M.D., complaining of hand and finger pain for many years. AR 725. Dr. Luo observed swelling and deformity of Plaintiff's finger joints. AR 725. He recommended over-the-counter pain medications and referred Plaintiff to a rheumatologist. On August 18, 2016, rheumatologist Farah Hasan Mahmood, M.D., ruled out rheumatoid arthritis and diagnosed osteoarthritis. AR 734. Dr. Mahmood noted bony deformities in fingers and thumbs of both hands. AR 738. Plaintiff had not filled the prescription for Lodine issued by Dr. Cronin because of financial difficulties. AR 738. Dr. Mahmood encouraged Plaintiff to control her blood glucose since high levels aggravate osteoarthritis. AR 738.

### 2. **Endocrinology**

Plaintiff's primary diagnosis in endocrinology visits was "Type II or unspecified type diabetes mellitus with renal manifestations, uncontrolled." AR 268. The record includes

examination notes from appointments with Dr. Chao on November 21, 2014 (AR 327); January 28 (AR 357), March 25 (AR 393), August 28, 2015 (AR 494); and March 28 (AR 655), 2016 and with Nurse Practitioner Tracy Lynne Bondi on July 25 (AR 265), August 7, 2014 (AR 292), January 26 (AR 340), May 26 (AR 439), and December 14, 2015 (AR 590).[3]

Plaintiff's height is noted as five feet, four or five inches, with weight ranging from 189 to 210 pounds. AR 267, 295, 442, 747. On July 25, 2014, Plaintiff reported that she had changed her diet but did not walk as was recommended. AR 265. On November 21, 2014, Dr. Chao noted that Plaintiff was not motivated to diet or exercise, and that she would not see improvement without life style changes. AR 327-28. On May 26, 2015, Plaintiff reported that diet and exercise advice provided by Sutter's health education department was not helpful. AR 440.

Measured at appointments, Plaintiff's blood glucose ranged from 132 to 360. AR 295, 363, 442, 593, 734. Plaintiff's A1C ranged from 8.9 to 11.2 per cent. AR 295, 363, 442, 494, 593. At most appointments, Dr. Chao or Nurse Bondi noted that Plaintiff was not monitoring her blood glucose at home. AR 265-66, 340, 364, 440, 500, 590. At several appointments, Plaintiff claimed to be monitoring her blood glucose but could not provide a journal or device download of the glucose readings she had obtained. AR 397, 440. On January 26, 2015, Plaintiff told Nurse Bondi she had lost her glucose meter. AR 340. On May 26, 2015, Plaintiff told Nurse Bondi that she could not afford the test strips for her meter. AR 439-40. On January 28, 2015, Dr. Chao noted that Plaintiff's sugars were "out of control," and warned her that she already had developed irreversible complications of diabetes and could not manage her health issues without regular monitoring and record keeping. AR 365.

Because of her uncontrolled diabetes, Plaintiff developed diabetes-related kidney problems which worsened over time. AR 328. On August 28, 2015, Dr. Chao noted that Plaintiff had reached Stage III renal disease. AR 494. Consulting on Plaintiff's kidney disease, urologist

///

[3] Because the computer notes maintained at Sutter Health are detailed, lengthy, and repetitive, the citations refer only to the first page of the relevant note.

5

Kalluri Kishore, M.D., similarly recommended that Plaintiff monitor and control her diabetes and high blood pressure, and strongly advised her to lose weight.  AR 384.

Plaintiff also complained of pain and numbness in her hands and feet (symptoms of diabetic neuropathy).  AR 265.  On December 29, 2015, neurosurgeon Amith Jamoona, M.D., consulted on Plaintiff's diabetic neuropathy, which Dr. Jamoona described as stinging pain in Plaintiff's feet.  AR 606.  Noting that Plaintiff's blood pressure was high (198/106), Dr. Jamoona warned her that she needed to monitor and control her diabetes and high blood pressure.  AR 610.

Dr. Chao initiated insulin therapy on March 25, 2015.  AR 397.  On December 14, 2015, Nurse Bondi increased Plaintiff's insulin dosage and instructed her to take her insulin twice daily.  AR 590.

Plaintiff declined various procedures and medications.  She would not do laboratory testing unless she was fasting.  AR 265.  On August 7, 2014, Plaintiff declined Nurse Bondi's proposal to increase her Metformin dosage and add Trilipix to address "extremely elevated tryglycerides."  AR 297.  Plaintiff told Dr. Chao that she could not tolerate the increased Metformin dosage and that she did not want to take more medications.  AR 328.  When Dr. Chao opined that Plaintiff needed multiple medications to control her diabetes and its complications, Plaintiff had multiple objections based on possible side effects.  AR 397.  On May 26, 2015, Plaintiff told Nurse Bondi that she had stopped taking several medications because she could not afford them.  AR 439-40.  Plaintiff had a fatty liver but declined a recommended liver biopsy and later, a referral for a consultation with Dr. Nazareno, a liver specialist.  AR 297, 328, 340.

In appointments with Dr. Chao and Nurse Bondi, Plaintiff consistently denied chest pain, shortness of breath, nausea, vomiting, diarrhea, constipation, polyuria, polydypsia, and nocturia.[4] *See, e.g.,* AR 267, 295, 382,442, 593, 655.  On January 28, 2015, Plaintiff denied experiencing depression or anxiety attacks.  AR 360.

///

---

[4] A careful review of the administrative record reveals that Plaintiff reported different symptoms to her different doctors.  The hearing decision does not address this anomaly.

### 3. **Cardiology**

The record includes examination notes from appointments with cardiologist Charles Tsai, M.D., in or about August 2014 (AR 309), and with Nurse Practitioner Mari Kathryn Rossini on July 29 (AR 280), August 27 (AR 313), 2014, May 13 (AR 423), 2015, March 23 (AR 642), and April 13 (AR 687), 2016.

On July 29, 2014, Plaintiff saw Nurse Rossini and complained of fatigue, tightness and fullness of her chest (but not chest pain), and shortness of breath (dyspnea) with mild exertion. AR 280. Plaintiff's blood pressure was 150/90. AR 281. Plaintiff reported that she was experiencing stress at work. AR 281. Tearfully, Plaintiff told the nurse that her blood pressure was frequently elevated (systolic over 160, diastolic over 100) and she feared she was heading for a heart attack or stroke. AR 282. Nurse Rossini ordered Plaintiff off work until October 27, 2014, to enable her to get her blood pressure under control. AR 282.

Following a transthoracic 2D echocardiogram and doppler study, and a stress echocardiogram, both conducted on August 7, 2014, Dr. Tsai diagnosed chronic hypertensive cardiovascular disease and left ventricular hypertrophy with diastolic dysfunction. AR 313. The doctor noted that the left ventricular thickness had increased. AR 313.

On May 13, 2015, Nurse Rossini identified Plaintiff's primary cardiology diagnosis to be benign essential hypertension. AR 423. Plaintiff's blood pressure was 240/98. AR 426. Plaintiff told Rossini that when stressed she felt like she was going to pass out. AR 424. In view of recent neurological changes and poorly controlled risk factors, Rossini ordered a "head scan." AR 427.

On March 23, 2016, Nurse Rossini noted that Plaintiff continued to work.[5] AR 642. She diagnosed:

> 1. Chronic hypertensive cardiovascular disease with significant diastolic dysfunction and fluid overload;
>
> 2. Exertional angina with anterior neck pain/pressure associated with dyspnea, diaphoresus, and light headedness; and

---

[5] The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2014. AR 24.

3. Metabolic syndrome with numbers out of control (central obesity, hyperglycemia, hypertriglyceridemia, suboptimal HDL cholesterol, hypertension).

AR 642.

On April 13, 2016, Plaintiff reported worsening of exertional chest pressure and shortness of breath, accompanied by increased anxiety and fear of a heart attack or stroke. AR 687. Plaintiff reported that she was lying down frequently with her feet up due to edema in the pretibial region. AR 687. Rossini noted her intent to write a letter for Plaintiff as Plaintiff needed to stop working and get permanent disability. AR 688.

D. **Internal Medicine Consultation**

On November 19, 2015, internist Ritu Malik, M.D., conducted a consultative examination at the request of the state agency. AR 536-38. Dr. Malik diagnosed (1) back pain; (2) diabetes with report of neuropathy (with reassuring neuro exam here today); (3) report of congestive heart failure; (4) hypertension with elevated blood pressure today; and, (5) hand pain diagnosed as arthritis. AR 538. The doctor opined that Plaintiff could sit, stand, and walk for at least six hours in an eight-hour day, with frequent breaks to rest and reposition; carry 50 pounds occasionally and 20 pounds frequently; and, occasionally climb, balance, stoop, kneel, crouch, and crawl. AR 538. Plaintiff had no limitations on reaching, gross and fine handling, feeling, and grasping, nor any visual, communicative, or environmental limitations. AR 538.

E. **Mental Status Consultation**

Psychologist Jacklyn L. Chandler, Ph.D., conducted a consultative evaluation of Plaintiff's mental disability status on November 24, 2015. AR 541-544. Plaintiff told Dr. Chandler that her activities of daily living were limited by pain and fatigue. AR 542. Plaintiff was able to drive but could not take a bus by herself. AR 542. Although Plaintiff could prepare simple meals she could not perform simple household tasks such as washing dishes or doing laundry. AR 542. Plaintiff was unable to go grocery shopping unattended. AR 542. Plaintiff reported experiencing depression since she was in her 20s as well as symptoms of anxiety. AR 541-42. She was taking hormone replacement for depression. AR 542.

Despite Plaintiff's satisfactory performance on a mental status exam, Dr. Chandler observed Plaintiff to be moderately dysphoric and tearful.  AR 542-43.  Accordingly, she diagnosed Plaintiff with unspecified depressive disorder with anxious distress and panic attacks.  AR 543.  The doctor observed that Plaintiff had mild difficulty maintaining attention and concentration for the duration of the interview and moderate difficulty enduring the stress of the interview.  AR 544.  Plaintiff had moderate difficulty interacting appropriately with Dr. Chandler.  AR 544.  Dr. Chandler opined that Plaintiff's ability to interact with the public, supervisors, and coworkers appeared to be moderately impaired.  AR 544.

## IV.    Standard of Review

Pursuant to 42 U.S.C. §405(g), this court has the authority to review a decision by the Commissioner denying a claimant disability benefits.  "This court may set aside the Commissioner's denial of disability insurance benefits when the ALJ's findings are based on legal error or are not supported by substantial evidence in the record as a whole." *Tackett v. Apfel*, 180 F.3d 1094, 1097 (9th Cir. 1999) (citations omitted).  Substantial evidence is evidence within the record that could lead a reasonable mind to accept a conclusion regarding disability status.  *See Richardson v. Perales*, 402 U.S. 389, 401 (1971).  It is more than a scintilla, but less than a preponderance.  *See Saelee v. Chater*, 94 F.3d 520, 522 (9th Cir. 1996) (internal citation omitted).  When performing this analysis, the court must "consider the entire record as a whole and may not affirm simply by isolating a specific quantum of supporting evidence." *Robbins v. Social Security Admin.*, 466 F.3d 880, 882 (9th Cir. 2006) (citations and internal quotation marks omitted).

If the evidence reasonably could support two conclusions, the court "may not substitute its judgment for that of the Commissioner" and must affirm the decision.  *Jamerson v. Chater*, 112 F.3d 1064, 1066 (9th Cir. 1997) (citation omitted).  "Finally, the court will not reverse an ALJ's decision for harmless error, which exists when it is clear from the record that the ALJ's error was inconsequential to the ultimate nondisability determination." *Tommasetti v. Astrue*, 533 F.3d 1035, 1038 (9th Cir. 2008) (citations and internal quotation marks omitted).

## V.     The Disability Standard

> To qualify for benefits under the Social Security Act, a plaintiff
> must establish that he or she is unable to engage in substantial
> gainful activity due to a medically determinable physical or mental
> impairment that has lasted or can be expected to last for a
> continuous period of not less than twelve months. 42 U.S.C. §
> 1382c(a)(3)(A).   An individual shall be considered to have a
> disability only if . . . his physical or mental impairment of
> impairments are of such severity that he is not only unable to do his
> previous work, but cannot, considering his age, education, and work
> experience, engage in any other kind of substantial gainful work
> which exists in the national economy, regardless of whether such
> work exists in the immediate area in which he lives, or whether a
> specific job vacancy exists for him, or whether he would be hired if
> he applied for work.
>
> 42 U.S.C. §1382c(a)(3)(B).

To achieve uniformity in the decision-making process, the Commissioner has established a sequential five-step process for evaluating a claimant's alleged disability.  20 C.F.R. §§ 416.920(a)-(f).  The ALJ proceeds through the steps and stops upon reaching a dispositive finding that the claimant is or is not disabled.  20 C.F.R. §§ 416.920(a)(4).  The ALJ must consider objective medical evidence and opinion testimony.  20 C.F.R. §§ 416.927; 416.929.

Specifically, the ALJ is required to determine: (1) whether a claimant engaged in substantial gainful activity during the period of alleged disability, (2) whether the claimant had medically determinable "severe impairments," (3) whether these impairments meet or are medically equivalent to one of the listed impairments set forth in 20 C.F.R. § 404, Subpart P, Appendix 1, (4) whether the claimant retained the residual functional capacity ("RFC") to perform his past relevant work, and (5) whether the claimant had the ability to perform other jobs existing in significant numbers at the national and regional level.  20 C.F.R. §§ 416.920(a)-(f).

## VI.     Summary of the ALJ's Decision and the Issues Presented

Using the Social Security Administration's five-step sequential evaluation process, the ALJ determined that Plaintiff did not meet the disability standard.  AR 22-31.  The ALJ found that Plaintiff had not engaged in substantial gainful activity since July 1, 2014 (the alleged onset date).  AR 24.  Plaintiff's severe impairments included (1) chronic heart failure, (2) hypertension,

(3) degenerative disc disease, (4) chronic kidney disease, (5) peripheral neuropathy, and (6) diabetes mellitus. AR 24. The severe impairments did not meet or medically equal one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. §§ 416.920(d); 416.925; and 416.926). AR 25. The ALJ found that Plaintiff retained the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b). AR 25.

At step five, the ALJ relied on the testimony of the vocational expert to find that Plaintiff was capable of performing her past relevant work as an operating room technician and medical assistant. AR 31. Accordingly, the ALJ found that Plaintiff was not disabled. AR 31.

Plaintiff challenges the agency's decision contending that the ALJ failed to give specific and legitimate reasons for rejecting the opinions of Plaintiff's treating neurologist and primary care physician, and to take into account the effect of Plaintiff's multiple impairments. Doc. 15 at 11-19. Plaintiff further contends that the ALJ erred in finding her mental impairment to be nonsevere. Doc. 15 at 20-23. The Commissioner disagrees, contending that the ALJ properly resolved conflicting medical opinion and fully explained the reasons for his determination. Doc. 18 at 5-12.

**VII.** **ALJ's Failure to Designate Plaintiff's Mental Impairment Severe at Step Two Was Not a Reversible Error**

At step two, the ALJ acknowledged Plaintiff's claimed depression but rejected its inclusion as one of Plaintiff's severe impairments. Plaintiff contends that the ALJ erred in failing to characterize her mental issues as a severe impairment. The Commissioner disagrees, contending that Plaintiff failed to provide sufficient evidence to support a finding that her mental problems were a severe impairment. In light of the record as a whole and applicable law, the Court concludes that the ALJ's step two failure to characterize Plaintiff's mental issues as a severe impairment was not reversible error.

**A.** **Legal Standard**

At step two off the disability analysis, the ALJ must determine whether a claimant has one or more medically determinable physical or mental "severe impairments" that have lasted or are

11

expected to last for a continuous period of at least twelve months.  20 C.F.R. §§ 404.1520(a)(4)(ii); 404.1509.  A "medically determinable impairment" must result from an anatomical, physiological, or psychological abnormality that can be shown by medically acceptable clinical and laboratory diagnostic techniques.  20 C.F.R. § 1521.  Establishing a mental impairment requires objective medical evidence from an acceptable medical source.  *Id.* An ALJ cannot find a mental impairment to be severe based solely on the claimant's statement of symptoms, a diagnosis, or a medical opinion.  *Id.*

A mental impairment is not severe if it does not significantly limit the claimant's ability to perform basic work activities, such as understanding, carrying out, and remembering simple instructions; responding appropriately to supervision, co-workers, and usual work situations; and dealing with changes in a routine work setting.  20 C.F.R. 404.1522.  To identify a severe mental impairment, an ALJ must follow the evaluation technique outlined in 20 C.F.R. § 404.1520a.

### B.    Hearing Decision

At step two, the ALJ recognized that Plaintiff had been diagnosed with depression among other non-severe impairments but concluded that Plaintiff's depression did not cause any functional limitations, either alone or in combination with Plaintiff's other impairments.  AR 24. The ALJ did not further discuss Plaintiff's depression or other mental impairment at step two.

In determining Plaintiff's residual functional capacity later in the hearing decision, however, the ALJ analyzed in detail the evidence of Plaintiff's mental impairment: Plaintiff testified that she had been terminated from her last job as an operating room technician for health issues and had been reprimanded.  AR 26.  She also testified that her depression "caused her to avoid going out in public as much as possible."  AR 26.  "The claimant stopped working after being given a 'stress leave' by her doctor, at her request, and while off work she was terminated from her job."  AR 27 (internal citations to record omitted).  When examined on November 21, 2014, Plaintiff told Dr. Chao that although she had been fired from her job, she was quite happy. AR 27 (internal citation omitted).  Noting that the record does not disclose the specifics of her work that resulted in Plaintiff's feeling stressed, the ALJ concluded that Plaintiff sought to leave

her job because it was emotionally stressful, not because she was unable to perform the work. AR 27.

On December 29, 2015, Plaintiff reported that she felt depressed from time to time since she had been out of work. AR 28. "The claimant alleged depression and anxiety, but the consultants noted that she had declined antidepressants." AR 28. "A state agency psychologist diagnosed unspecified depression, but found the claimant to have mild mood symptoms, consistent with a non-severe impairment." AR 28.

The ALJ gave little weight to Dr. Chandler's opinion:

> The doctor diagnosed unspecified depressive disorder with anxious distress and panic attacks. As to the claimant's functional limitations, the doctor found the claimant to have only mild difficulty maintaining attention and concentration during the evaluation, but demonstrated moderate difficulty handling the stress of the interview. The doctor stated that based on observations and report of symptoms by the claimant, she was moderately impaired in the ability to interact with the public, coworkers, and supervisors. I give little weight to this opinion. The claimant has had minimal treatment, and has declined to take anti-depressive medications. Her symptoms are not continuous, as she told her doctor in December 2015 that symptoms occur "from time to time."

AR 29.

Similarly, the ALJ gave little weight to Nurse Rossini's June 9, 2016, statement that Plaintiff "had multiple medical issues with anxiety" and "was not a candidate to be in the workforce." AR 29. The ALJ reasoned that (1) Nurse Rossini was not an acceptable medical source,[6] (2) the record did not support the conclusion that Plaintiff's symptoms had worsened, and (3) the opinion did not refer to specific supporting facts or treatment history. AR 29-30.

As to the remaining opinions of Plaintiff's mental health, the ALJ wrote:

> Kathryn Richardson, another Nurse Practitioner, stated on September 19, 2016, that the cla[i]mant had diagnoses of bipolar I mood disorder, amnesia, depression, PTSD from a difficult childhood, all of which had exacerbated her cardiac condition. The

---

[6] The Social Security Administration has recently adopted new rules applicable to claims filed after March 27, 2017, which expand the category of acceptable medical providers to include, among others, nurse practitioners. 20 C.F.R. §§ 404.1502(a)(6), (7), (8); 416.902(a)(6), (7), (8) (2017); Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 Fed. Reg. 5844 (Jan. 18, 2017). The revisions do not apply to Plaintiff's claim, which was filed April 6, 2015.

nurse stated that the claimant was unable to focus, and high anxiety, including panic attacks in the work environment caused the claimant to be nonfunctional with daily tasks. Ms. Richardson stated that the claimant was undergoing counseling and medication management to help her maintain and regain emotional control of her life. The statement appears to be countersigned by Hetnal Mieczyslaw, M.D. This opinion is given little weight. It is inconsistent with the medical record as a whole. For example, Kathie Cronin, M.D., saw the claimant on March 16, 2016, and diagnosed bipolar I as a "primary encounter diagnosis" but stated that she was not a psychiatrist and not qualified to tell the claimant if medications would be effective. Dr. Cronin suggested that the claimant be referred to Behavioral Health for psychiatric review. There is no evidence in the record that the claimant was ever examined or evaluated by Dr. Mieczyslaw, and even if claimant was properly diagnosed by a psychiatrist with bipolar I, the condition has not existed for the required 12 months of continuous duration. There are no treatment records from Dr. Mieczyslaw to suggest that he saw the claimant and did anything other than counter-sign the opinion of the nurse practitioner, not an acceptable source. It is also noted that based on claimant's reported symptoms, she was referred for a psychiatric evaluation on April 16, 2015, more than a year earlier than the report of Nurse Richardson. There is no medical record of follow-up psychiatric evaluation or assessment.

AR 30 (internal references to record omitted).[7]

## C.  **Omission of Discussion at Step Two**

Relying on *Webb v. Barnhart*, 433 F.3d 683, 686 (9th Cir. 2006), Plaintiff contends that "[a]n ALJ may conclude an impairment is nonsevere only when the ALJ's conclusion is clearly established by medical evidence." Doc. 15 at 20 (internal quotation marks and citation omitted). This case is distinguishable from *Webb*. In that case, despite extensive medical evidence establishing Mr. Webb's back pain, hypertension, knee pain, hip pain, visual disturbances, memory loss, diverticulitis, lack of sleep, difficulty performing physical tasks, and lack of employment from 1991 to 1997, the ALJ found that Webb did not have any medically severe

---

[7] The Court is also perplexed by Dr. Cronin's listing Plaintiff's complaint of bipolar disorder as a "primary diagnosis," in light of her note that she told Plaintiff "I am not a psychiatrist and not qualified to tell you if you have bipolar or if medications would make you worse." AR 625. However, on April 15, 2015, Dr. Cronin also included a diagnosis of bipolar I disorder and referred Plaintiff to either Sutter's Behavioral Health department or County Mental Health. AR 408. In the April 2015 notes, Dr. Cronin set forth Plaintiff's laundry list of mental health symptoms and noted that Plaintiff had received counselling from "Dr. Jim Henman for years" but was then seeing no one for mental health issues. AR 409. On August 26, 2015, Dr. Cronin again included a diagnosis of bipolar disorder (AR 475) and noted "Seeing counselors on McHenry. Wants to see our Behavioral Health." AR 480. The record includes no treatment records from McHenry (presumably County Mental Health) or Dr. Henman.

14

impairment or combination of impairments before his disability insurance coverage lapsed in 1997.  433 F.3d at 686-87.  Although the medical record provided an incomplete picture of Webb's overall health during the relevant period, the Ninth Circuit court held that the record included sufficient evidence of disability to pass "the de minimus threshold of step two."  *Id.* at 687.  "[A]lthough Webb ultimately bears the burden of establishing his disability, the ALJ had an affirmative duty to supplement Webb's medical record, to the extent that it was incomplete, before rejecting Webb's petition at so early a stage in the analysis."  *Id.*  In other words, by finding that Webb's physical impairments were not severe at step two, the ALJ circumvented his duty to supplement the record and more importantly, foreclosed Webb's opportunity to secure disability insurance benefits.

In contrast, the record here was more extensive and the state agency had supplemented Plaintiff's medical records with a consultative examination.  Plaintiff's claim was not prematurely foreclosed at step two but continued to the more extensive analysis of her residual functional capacity at step four.  When an ALJ fails to characterize an impairment as severe at step two, but continues to extensively discuss that impairment at step four, any error at step two is harmless.  *Lewis v. Astrue*, 498 F.3d 909, 911 (9th Cir. 2007).  *Accord Bickell v. Astrue*, 343 Fed.Appx. 275, 278 (9th Cir. 2009); *Nielsen v. Comm'r of Soc. Security*, 2017 WL 2190065 at \*2 (D. Oregon May 16, 2017).

**VIII.  <u>The ALJ Properly Analyzed Medical Opinion</u>**

Plaintiff contends that the ALJ failed to provide legally adequate reasons for rejecting the opinions of Drs. Tsai and Cronin, and Nurse Practitioner Rossini.  The Commissioner counters that the ALJ appropriately set forth his reasoning for giving greater weight to the opinions of agency physicians over those of Plaintiff's physicians.

**A.  <u>ALJ's Analysis of Residual Functional Capacity</u>**

Following an extensive analysis of the record as a whole, the ALJ concluded that Plaintiff had the residual functional capacity to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b).  *See* AR 25-31.  The ALJ found that the objective medical evidence did not

support the Plaintiff's representations of the severity, intensity, and limiting effects of her impairments. AR 25-27. Cardiac testing indicated function within normal limits, except for some mild problems. AR 28. Plaintiff's back problems had not recurred following successful laminectomy and discectomy surgeries in 2008. AR 28. Subsequent testing revealed some degenerative changes after the back surgery, but no neural compromise, and no further surgery or other treatment had been recommended. AR 28.

The record was replete with evidence of diabetes and high blood pressure, but Plaintiff did not regularly monitor either of these conditions despite possessing the devices to do so at home. AR 28. She declined to lose weight through diet and exercise. AR 28. Although Plaintiff experienced some episodic depression, the record included no evidence of treatment or follow-up assessments. AR 28. Similarly, little medical evidence supported Plaintiff's subjective claims of fatigue, dizziness, and other side effects. AR 28.

The ALJ noted that although Plaintiff had sometimes attributed her leaving her last job due to her impairments, she had stated in her adult functional report that her manager had wrongfully terminated her for behavioral issues. AR 26. Citing to multiple sources of evidence in the record, the ALJ found that Plaintiff sought to stop working because she found her job stressful, not because she was physically unable to perform the work. AR 27-28.

The ALJ gave great weight to the December 10, 2015, and April 4, 2016, summaries provided by the state agency medical and psychological consultants. AR 28. The summaries were "based on a careful and thorough review of the medical evidence, documenting treatment dates and clinical findings or diagnostic test results, and adequately considered the claimant's subjective range of symptoms." AR 29. Nonetheless, the ALJ rejected the opinions of those consultants who found Plaintiff capable of performing work at a medium functional capacity, finding that light work was more consistent with Plaintiff's treatment history, clinical observations, and findings set forth in the record. AR 29. The ALJ gave little weight to the brief and conclusory opinions of Plaintiff's treating physicians (AR 29-30), as will be discussed below.

///

16

**B.** **Applicable Law**

The opinions of treating physicians, examining physicians, and non-examining physicians

are entitled to varying weight in disability determinations. *Lester v. Chater*, 81 F.3d 821, 830 (9th

Cir. 1995). Ordinarily, more weight is given to the opinion of a treating professional, who has a

greater opportunity to know and observe the patient as an individual. *Id.*; *Smolen v. Chater*, 80

F.3d 1273, 1285 (9th Cir. 1996). The opinion of an examining physician is, in turn, entitled to

greater weight than the opinion of a non-examining physician. *Pitzer v. Sullivan*, 908 F.2d 502,

506 (9th Cir. 1990). An ALJ may reject an uncontradicted opinion of a treating or examining

medical professional only for "clear and convincing" reasons. *Lester*, 81 F.3d at 831. In contrast,

a contradicted opinion of a treating professional may be rejected for "specific and legitimate"

reasons. *Id.* at 830. In any event, the opinions of a treating or examining physician are "not

necessarily conclusive as to either the physical condition or the ultimate issue of disability."

*Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 600 (9th Cir. 1999).

The opinion of a non-examining physician may constitute substantial evidence when it is

"consistent with independent clinical findings or other evidence in the record." *Thomas v.*

*Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002). Such independent reasons may include laboratory

test results or contrary reports from examining physicians, and Plaintiff's testimony when it

conflicts with the treating physician's opinion. *Lester*, 81 F.3d at 831, citing *Magallanes v.*

*Bowen*, 881 F.2d 747, 755 (9th Cir. 1989).

Nurse practitioners are not evaluated as if they were physicians. A nurse practitioner is

not considered an acceptable medical source under 20 C.F.R. § 416.913. Instead, nurse

practitioners are considered to be other sources. 20 C.F.R. § 416.913(d)(1) (listing medical

sources that are considered other sources, including nurse practitioners, physicians assistants,

naturopaths, chiropractors, audiologists, and therapists). Unlike the opinions of physicians, the

opinions of nurse practitioners are not entitled to special weight. An ALJ may reject the opinions

of other sources by giving "reasons germane to each witness for doing so." *Molina v. Astrue*, 674

F.3d 1104, 1111 (9th Cir. 2012); *Turner v. Comm'r of Soc. Sec. Admin.*, 613 F.3d 1217, 1224 (9th

Cir. 2010). Factors used to evaluate a nurse practitioner's opinion include: (1) examining

relationship; (2) length of treatment relationship and frequency of examination; (3) supportability

of opinion; (4) consistency with the record; (5) specialization; and (6) other factors supporting or

contradicting the opinion. 20 C.F.R. § 416.927 (c) and (f)(1).

## C.     Dr. Tsai

Plaintiff contends that the ALJ failed to give specific and legitimate reasons for rejecting

Dr. Tsai's opinion. Emphasizing that residual functional capacity concerns the effect of

Plaintiff's impairments on her ability to do work rather than the mere existence of physical

ailments, the Commissioner counters that Dr. Tsai had insufficient interaction with Plaintiff to

support his opinion. The Court agrees that the ALJ's determination to give Dr. Tsai's opinion

little weight was supported by sound reasoning and sufficient credible evidence in the record as a

whole. As a result, even if the record could also support the outcome urged by Plaintiff, the court

"may not substitute its judgment for that of the Commissioner" and must affirm the decision.

*Jamerson*, 112 F.3d at 1066 (9th Cir. 1997).

## 1.     Dr. Tsai's Opinion

On October 17, 2016, Dr. Tsai completed a two-page questionnaire concerning Plaintiff's

impairments. AR 765-66. Plaintiff's attorney forwarded the questionnaire to the ALJ on October

19, 2016, following the administrative hearing. AR 767.

Dr. Tsai identified Plaintiff's primary impairments as exertional breathlessness, exertional

chest discomfort, Type 2 Diabetes, Stage 3 chronic kidney disease, and poorly controlled

hypertension. AR 765. The objective finding on which he based his opinion was "heart failure

with preserved ejection fraction." AR 765.

The doctor answered, "Yes," to the question: "Do you feel that the medical problems for

which you have treated the claimant preclude her from performing full-time work at any exertion

level, including the sedentary level (defined by Social Security as lifting no more than 10 pounds,

sitting for 6 hours in an 8-hour workday, and standing walking for 2 hours in an 8-hour

workday?" AR 765. He opined that Plaintiff could sit for less than "two hours at a stretch," but

did not indicate how long she was able to stand or walk in an eight-hour workday. AR 765. She should lie down or elevate her legs as much as possible during breaks or rest periods. AR 765. Plaintiff could lift 15-20 pounds frequently. AR 766. In response to the question of how much Plaintiff could lift occasionally, Dr. Tsai responded, "Once every 2-3 hours." AR 766. He gave the same responses to the questions (1) seeking the percentage of an 8-hour work day that Plaintiff could perform specific operations with her hands and (2) seeking the duration that Plaintiff could perform those activities without resting: unlimited handling, feeling, and fine finger manipulation; reaching/grasping once every 1-2 hours; and pushing/pulling once every 3-4 hours. AR 766.

## 2. The Hearing Decision

The ALJ gave Dr. Tsai's opinion little weight, writing:

> According to the medical evidence, Dr. Tsai saw the claimant on August 2014 for cardiac testing, which included an electrocardiogram, exercise stress test, and Doppler study of the heart. The findings were negative for exercised induced segmental wall abnormalities and absence of significant exercise induced ischemia. The left ventricular size and systolic function were normal, but there was evidence of left ventricular hypertrophy. Left atrial size was normal, and there was only mild tricuspid regurgitation. There was no significant pericardial or pleural effusion. Other than this occurrence more than two years ago, there is little indication that Dr. Tsai ever saw or examined the claimant again and there are no cardiac tests that would support the limitations checked off in the boxes. The doctor has not had recent contact with the claimant, updated examinations, or testing to support the suggested limitations.

AR 30-31.

## 3. The ALJ Correctly Gave Little Weight to Dr. Tsai's Opinion

Even though Plaintiff's contact with the cardiology department overwhelmingly consisted of periodic visits to Nurse Rossini for blood pressure monitoring, Plaintiff argues that because Dr. Tsai was her "treating physician" and part of her treatment team, his opinion deserved controlling weight. The Court disagrees.

Generally, an ALJ will defer to a treating physician's opinion because he is employed to cure and has a greater opportunity to know and observe the patient as an individual. *Sprague v.*

19

*Bowen*, 812 F.2d 1226, 1230 (9th Cir. 1987). Nonetheless, a treating physician's opinion is not conclusive as to the claimant's physical condition or the ultimate issue of disability. *Magallanes*, 881 F.2d at 751. Thus, Dr. Tsai's opinion that Plaintiff was incapable of performing any work, even at the sedentary level, was not conclusive on the legal question of whether Plaintiff was disabled for purposes of disability insurance benefits.

Dr. Tsai had limited contact with Plaintiff in or about August 2014 and completed the questionnaire in October 2016, thus his knowledge of Plaintiff's residual functional capacity was both limited and out of date. He had never examined, tested, or treated Plaintiff's hands. The doctor's responses to the questionnaire were perfunctory and frequently nonresponsive to the question asked. As the ALJ summarized, the results of the 2014 testing did not support Dr. Tsai's opinion that Plaintiff's ability to sit and lift was severely limited. When evaluating conflicting medical opinions, an ALJ need not accept the opinion of a doctor that is brief, conclusory, and inadequately supported by clinical findings. *Bray v. Comm'r of Soc. Sec. Admin.*, 554 F.3d 1219, 1228 (9th Cir. 2009); *Bayliss v. Barnhart*, 427 F.3d 1211, 1216 (9th Cir. 2005); *Tonapetyan v. Halter*, 242 F.3d 1144, 1149 (9th Cir. 2001).

### D. Dr. Cronin

Plaintiff contends that the ALJ erred in rejecting Dr. Cronin's opinion that Plaintiff's hand pain had limited her activities of daily living, such as caring for her hair, turning on the lights, and using her computer. Doc. 15 at 22-23. Plaintiff maintains that the ALJ failed to provide sufficient credible evidence to support this finding.

### 1. Dr. Cronin's Opinion

Dr. Cronin's letter opinion, dated September 20, 2016, reads as follows:

> [Plaintiff] has seen me since June of 2015 and has been having pain in her hands and generalized since I first saw her. She has been sent to appropriate specialists for her medical sources including a Rheumatologist for her hand osteoarthritis. Her hand pain has limited her activities of daily living such as turning on the lights, caring for her hair and using her computer.
>
> AR 764.

## 2.     The Hearing Decision

The ALJ wrote:

> Dr. Cronin provided a statement dated September 20, 2016, indicating that the claimant had generalized pain in her hands since she started treatment in June 2015.  The claimant had been sent to appropriate specialists, including a Rheumatologist.  Dr. Cronin stated that the pain limited the claimant's activities of daily living such as turning on the lights, caring for her hair and using a computer.  I give little weight to this opinion as the extent of limitations are largely accepted from the claimant's subjective report, rather than from actual examination and office testing.

AR 30 (citation to record omitted).

## 3.     ALJ's Finding Supported By Record

Although the ALJ found that Dr. Cronin's exemplary activities, turning on lights, flipping switches, and caring for hair, reflected subjective reporting by Plaintiff, nothing in the record directly supports his conclusion that Plaintiff likely represented these activities as painful. On the other hand, nothing in the record supports Dr. Cronin's representation that hand pain affected these and other ordinary activities of daily living.  As a result, assessing the functional impact of Plaintiff's hand pain on her residual functional capacity required the ALJ to consider all objective evidence available in the record.  Such an analysis does not support Dr. Cronin's claim that Plaintiff's hand pain was disabling.

A reviewing court must uphold an ALJ's findings if they are supported by inferences reasonably drawn from the record.  *Batson v. Comm'r, Soc. Security Admin.*, 359 F.3d 1190, 1193 (9th Cir. 2004).  Considered as a whole, the record supports the conclusion that Dr. Cronin's opinion was not based on actual examination or testing.  In fact, nothing in the record indicates that Dr. Cronin did more than acknowledge Plaintiff's complaints of hand pain, visually observe Plaintiff's hands, and recommend the use of a gel pain reliever (Lodine).[8]

///

///

---

[8] Plaintiff did not purchase and apply the gel pain reliever prescribed by Dr. Cronin, finding it too expensive.  AR 738.  The record does not indicate whether Plaintiff tried over-the-counter pain relievers as suggested by Dr. Luo.

Dr. Cronin, Dr. Luo, and Dr. Mahmood treated Plaintiff at Sutter Health.  All three doctors diagnosed osteoarthritis in Plaintiff's finger joints and prescribed medication to relieve pain.  None of the doctors at Sutter conducted range of motion or other functional testing.

In contrast, examining physician Ritu Malik noted "tenderness to palpation at dorsal IP joints diffusely in hands," but assessed Plaintiff's grip strength as 5/5.  AR 537.  Plaintiff's fine finger movements were normal.  AR 537.  Dr. Malik opined that Plaintiff had "no manipulative limitations on reaching, gross and fine handling, feeling and grasping."  AR 538.

Agency physician Roger Fast observed, "She alleges hand pain and has Heberden nodes, but limitations in strength and [range of motion] are not documented."  AR 64.  Dr. Fast added, "I agree that claimant's impairments are not listing level, and to some extent her disability is subjective.  However, her symptoms are due to credibly established impairments, and I think a light [residual functional capacity] would be more appropriate than medium."  AR 64.  Another agency physician, Beverly Morgan, M.D., agreed with Dr. Fast's assessment of Plaintiff's hand complaints.  AR 74.

It is possible that the ALJ erred in attributing the enumerated day-to-day difficulties to Plaintiff's subjective representations of her impairments.  It does not matter.  Objective evidence in the record as a whole indicates that the osteoarthritis in Plaintiff's finger joints was not so debilitating as to merit a conclusion that Plaintiff is fully disabled under applicable law.

**E.    Nurse Rossini**

Plaintiff contends that the ALJ erred in failing to consider fully Nurse Rossini's opinion since the nurse was an "other medical source" offering an opinion on the impact of Plaintiff's heart failure on her functioning.  Doc. 15 at 20.  The Commissioner counters that the ALJ appropriately rejected Nurse Rossini's opinion as inconsistent with the medical evidence.  Doc. 18 at 8.

**1.    Nurse Rossini's Opinion**

Nurse Rossini submitted a letter dated June 3, 2016, in support of Plaintiff's disability application.  AR 114.  The nurse identified Plaintiff's diagnoses as moderate to severe concentric

left ventricular hypertrophy, signs and symptoms of fluid overload, mild aortic stenosis, mild

pulmonary hypertension, atherogenic dyslipidemia, Type II diabetes mellitus, fatigue, dyspnea,

and thyroid abnormality.  AR 114.  She wrote:

> Over time we usually see patient symptoms improve with medical
> management/treatment.  Unfortunately, that has not been the case
> with [Plaintiff].  Her symptoms have actually progressed to be
> worse with progressive fatigue, exertional chest pressure, and
> dyspnea.  With minimal exertion and now with even mild emotional
> stress, [Plaintiff] has developed additional objective symptoms of
> lower extremity edema (requiring that she elevate her legs
> frequently throughout the day), and elevated blood pressures that
> have been refractory to medical management.  In addition to the
> symptoms above, she has subjective symptoms of chest pressure in
> which she is always concerned that she is "having a heart attack."
> She has to take frequent naps throughout the day because of her
> medications and symptoms.  She senses "pounding" in her neck
> with minimal exertion and with mild stress.  She additionally notes
> a temperative intolerance to either warm or cool weather and notes
> her symptoms are significantly worse with hot/cold weather.
>
> With her enlarged heart, elevated blood pressures, and increased
> left ventricular and diastolic pressures—we have not been able to
> control her symptoms and this also explains her anxiety likely
> related to hypoxia.  She is not a candidate to be in the workforce at
> this point in her life and because we have been attempt[ing] to treat
> her for eight years with no significant improvement and actually
> worsening of her signs/symptoms, she is not a candidate to consider
> working indefinitely.

AR 114.

The ALJ did not refer directly to Nurse Rossini's letter, instead commenting on the

following treatment note, date June 6, 2016:

> PLAN:  We will write a letter to recommend permanent disability
> as the patient's multiple medical issues and now with added anxiety
> issues—poorly controlled hypertension.  She is not a candidate to
> be in the workforce as we have been attempting to adjust/improve
> her numbers for a prolonged period of time unfortunately without
> improvement and actually worsening.  We will plan to see her in
> followup in 4 months.  She is to continue to perform blood pressure
> checks at home and report blood pressure numbers to us.  If
>
> persistently greater than 130/80 or if questions or problems or
> changes occur in the interim [*sic*].

AR 688.

///

## 2. **Hearing Decision**

The ALJ wrote:

> A nurse practitioner examined the claimant on June 9, 2016 and wrote in the treatment record that the claimant had multiple medical issues with anxiety, and was not a candidate to be in the workforce. The claimant's symptoms had worsened despite treatment and the nurse recommended permanent disability. This opinion is given little weight as it is not from an acceptable medical source and the medical record does not show that the claimant's symptoms have worsened, but have remained stable or improved with ongoing treatment. The opinion does not reference specific facts or prior treatment history that supports the statement that symptoms worsened or that the claimant was precluded from all basic work activity.

AR 29-30 (reference to record omitted).

## 3. **Plaintiff's Ability to Function**

Nurse Rossini's opinion is overshadowed by her conclusion that Plaintiff was completely disabled and should not be working. To the extent that Rossini's opinion is that Plaintiff is permanently disabled, her opinion was entitled to little weight since the Commissioner "will not give any significance to the source of an opinion on issues reserved to the Commissioner," including whether a claimant is disabled. *Calhoun v. Berryhill*, 734 Fed.Appx. 484, 487 (9th Cir. 2018) (quoting 20 C.F.R. § 404.1527(d)(3)) (citing *McLeod v. Astrue*, 640 F.3d 881, 884-85 (9th Cir. 2011).

Further, whether Plaintiff's impairments have or have not worsened is immaterial in the absence of evidence establishing how these impairments affect Plaintiff's ability to perform work. The Ninth Circuit has explained:

> An impairment is a purely medical condition. A disability is an administrative determination of how an impairment, in relation to education, age, technological, economic, and social factors, affects ability to engage in gainful activity. The "relationship between impairment and disability remains both complex and difficult, if not impossible, to predict . . . The same level of injury is in no way predictive of an affected individual's ability to participate in major life functions (including work) . . . Disability may be influenced by

///

///

physical, psychological, and psychosocial factors that at can change over time." The law reserves the disability determination to the Commissioner.

*McLeod*, 640 F.3d at 885 (footnotes omitted).

The ALJ appropriately gave little weight to Nurse Rossini's conclusory opinion that Plaintiff was disabled.

### IX. <u>Combined Impact of Multiple Impairments</u>

Plaintiff contends that the ALJ failed to consider the combined impact of her many impairments on her functioning. The Commissioner responds that Plaintiff's argument is belied by a reading of the hearing decision as a whole. The Court agrees with the Commissioner that after considering Plaintiff's multiple ailments and their interactions with each other, the ALJ reached a decision that Plaintiff had the capacity to perform light work.

Because of Plaintiff's multiple impairments and their interactions with each other, the ALJ gave great weight to the analyses and opinions of the state agency and psychological consultants, prepared on December 10, 2015, and April 4, 2016. AR 28-29. Nonetheless, the ALJ rejected the recommendations of some consultants that Plaintiff retained the residual functional capacity for medium work and found that "a light residual functional capacity was more consistent with the treatment history and clinical observations and findings contained in the record." AR 29. Nothing more was required.

///

///

///

///

///

///

///

///

///

25

**X.    Conclusion and Order**

Based on the foregoing, the Court finds that the ALJ's decision that Plaintiff is not disabled is supported by substantial evidence in the record as a whole and is based on proper legal standards.  Accordingly, this Court DENIES Plaintiff's appeal from the administrative decision of the Commissioner of Social Security. The Clerk of Court is directed to enter judgment in favor of Defendant, Nancy A. Berryhill, Acting Commissioner of Social Security, and against Plaintiff, Dena Colleen Mott.

IT IS SO ORDERED.

Dated:   **September 19, 2018**                **/s/ Gary S. Austin**
                                     UNITED STATES MAGISTRATE JUDGE